UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TAWNY BLAZEJOWSKI,

     Petitioner,

v.                               Case No. 3:20-cv-1386-HES-JBT

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

     Respondents.

_____

## ORDER

### I. Status

Petitioner Tawny Blazejowski, an inmate of the Florida penal system,

initiated this action by filing a Petition for Writ of Habeas Corpus under 28

U.S.C. § 2254 (Petition; Doc. 1).[1] Blazejowski proceeds on an Amended Petition

(Doc. 5). In the Amended Petition, Blazejowski challenges a 2014 state court

(St. Johns County, Florida) judgment of conviction for three counts of threats

or extortion, four counts of aggravated stalking, and one count of false report

of child abuse, abandonment or neglect. See Amended Petition at 1.

Blazejowski raises ten grounds for relief. Id. at 5-55. Respondents submitted a

---

[1] For all pleadings and exhibits filed in this case, the Court cites to the
document and page numbers as assigned by the Court's Electronic Case Filing
System.

Response to the Amended Petition (Response; Doc. 13). They also submitted

exhibits. See Docs. 13-1 through 13-4. Blazejowski filed a brief in reply (Reply;

Doc. 14) with exhibits (Docs. 14-1 through 14-3). This action is ripe for review.

## II. Factual and Procedural History

The following facts are taken from Blazejowski's initial motion for

postconviction relief under Florida Rule of Criminal Procedure 3.850 (Rule

3.850 Motion):

> **September 2012**
> This case began when [Blazejowski] and her ex-
> fiancé, Mr. Joseph Good, ended their relationship on
> September 24th, 2012. [Blazejowski] then
> immediately began firing off a series of harassing
> emails. The initial blast of emails contained photos of
> them together as a couple. The emails were first sent
> from her account (fl.law.ratb@gmail.com) to his email
> account at home (joe.good1265@comcast.net) and at
> work (cjmxg@allstate.com). But then, [Blazejowski]
> hijacked Mr. Good's account with Yahoo
> (joe.good1265@yahoo.com), changed the password,
> and sent out over a dozen pornographic emails to
> company executives at his work.
> She also emailed Mr. Good photos that were
> secretly taken inside his residence, photos of him
> undressed, a photo from Probation Plus, and a photo
> of a shovel stuck in the ground. She then returned to
> his Yahoo account, forwarded photos of him undressed
> to company executives at his work, removed her phone
> and email information, and then completed the late
> night crusade by sending out arrest photos of his ex-
> wife, Ms. Beth Love.
> The next morning, Tuesday the 25th of
> September, began with a barrage of emails from an
> account created in the likeness of his hijacked Yahoo

account. The fake account was created with Mr. Good's name and a nearly identical address (joegood1265@yahoo.com). At first the emails were passive aggressive and sarcastic ("HAVE A WONDERFUL DAY"). They then quickly turned to "*sex and porn at work.*"

By September 28th, [Blazejowski] had researched and outline[d] a plan for revenge with a goal of getting Mr. Good fired from his job at All State. A search of [Blazejowski's] computer, which was seized during the search warrant, revealed a guide on "HOW TO GET SOMEONE FIRED" and how to "GET REVENGE ON YOUR EX."

### October 2012

[Blazejowski] then began harassing Mr. Good's neighbor and co-worker at All State, Mrs. Jennifer Robor. On Monday the 15th of October, Mrs. Robor received mail hand addressed to her husband with no return information. The envelope contained a typed letter that alleged she was having an affair with Mr. Good while they were at work. Having never met or spoken to [Blazejowski], Mrs. Robor still suspected that the letter came from [Blazejowski]. [Blazejowski] denied sending the letter when she was questioned by Deputy Bagby. She also claimed that she didn't know Mrs. Robor or where she lived, and "*if Joe though[t] she was harassing him to prove it.*"

By Thursday the 18th of October, [Blazejowski] also began harassing Mr. Good's supervisor at All State, Mr. Scott Thomas. She sent him an email at 8:52 am under the disguise that it was from Mr. Good's ex-wife: "Beth Love" at owjamcab@yahoo.com. The subject was "JOE GOOD" and it warned:

YOU BETTER PUT A STOP TO JOE GOOD FUCKING MY WIFE AT WORK!!!! IF YOU DON'T DO SOMETHING ABOUT IT I WILL COME IN THERE PERSONALLY AND TAKE CARE OF IT MYSELF!! IF MY WIFE DOES NOT SUE ALLSTATE FOR SEXUAL HARASSMENT THEN I WILL AND THEN I

3

WILL DIVORCE HER AND [TAKE] EVERYTHING FROM HER.

The message appears as though it came from Mr. Matthew Robor, but evidence reveals that the account owjamcab@yahoo.com was created early that morning from an IP address registered to [Blazejowski] (208.96.177.239 -- from: 10/06/12 to 10/20/12).

[Blazejowski's] harassment then escalated when she had Mr. Good falsely arrested for domestic battery on the night of October 18th. Late that night, with a bloody shirt and face on, [Blazejowski] drove to the Sheriff's Office from her house (1307 Fireside Court, St. Augustine) and reported that Mr. Good hit her in the face. She painted a story for Deputy Galentine that she was the victim of a jealous and abusive ex-boyfriend. She included the claim that he "*seems to be having an affair at work and he blames me for her spouse finding out when I don't know her.*" Due to the physical evidence, Mr. Good was arrested at home that night by Deputy Romer. He later posted bond after First Appearance at the St. John's County Jail.

Later that night, Friday the 19th of October at 11:35 pm, [Blazejowski] sent another email to Mr. Thomas under the disguise of "Beth Love" at owjamcab@yahoo.com. The email warned "JOE GOOD ARRESTED" with a booking photo and message: "NOT AS INNOCENT AS HE WANTS YOU TO BELIEVE OR AS HE TELLS."

Five days after the initial arrest, on Wednesday the 24th of October, [Blazejowski] returned to the Sheriff's Office and reported that Mr. Good violated the no contact order in the domestic battery case. She claimed that he called her at 12:48 pm from a blocked number and said: "*if you don't drop the charges you will regret it and your next beating will be worth it.*" [Blazejowski] signed a sworn affidavit and warrant affidavit, but a second arrest was not made.

On the following day, October the 25th, [Blazejowski] petitioned for and was granted a temporary injunction against Mr. Good in St. Johns County Case No. 2012-1712DR. [Blazejowski] used the

arrest for domestic battery and the alleged violation of no contact as grounds for the injunction.

## November 2012

Within a month after their breakup, [Blazejowski] had obtained an injunction against Mr. Good, placed his job in jeopardy, and had him falsely arrested. She then returned to the Sheriff's Office on the 1st of November to report that Mr. Good was now violating the no contact order in both the domestic battery case and the injunction case. In a sworn affidavit, she claimed that Mr. Good left two threatening notes on her cars in the middle of the night. The first note read:

> I CAN'T BELIEVE YOU'RE DOING THIS TO US. YOU ONLY HAVE A COUPLE MORE DAYS TO CHANGE YOUR MIND BEFORE I DO IT FOR YOU WITH MY DICK IN YOUR MOUTH AND MY HANDS AROUND YOUR NECK!!! The second note read: "STOP YOUR MOTHER BEFORE I STOP HER AND YOU DON'T HAVE ONE!!!"

[Blazejowski] further alleged that she looked outside when her dogs started barking and she saw a Jeep similar to his leaving the scene. No arrest was made.

On the 26th of November, [Blazejowski] sent an email to local football coaches and the FHSAA advising them of Mr. Good's arrest for domestic battery. The email was nearly identical to the one that [Blazejowski] sent to Mr. Thomas in October.

[Blazejowski] then began directing threats to Mr. Good's daughter, Ms. Caroline Good. The Gainesville Police Department reported that they received a tip from Crime Stoppers on November 28th that Ms. Good was selling illegal drugs out of her dorm room on the University of Florida campus. A search revealed no drugs or contraband. Writings in a notebook later seized from [Blazejowski] show that she was likely the source of the tip.

**December 2012**

Since the reports in St. Johns County were not resulting in arrests, [Blazejowski] then began making reports in Duval County. On Friday the 14th of December, [Blazejowski] went to the Avenues Mall in Jacksonville and reported to Deputy Bialkoski that she received a call from a female who said: "*Stupid bitch, Joe still has a handgun, he showed it to me, and he wants you to know that he plans on using it on you if you continue to ask for the injunction.*" [Blazejowski] alleged the call could have come from Mr. Good's friend, Mrs. Chantal Allain. According to the report, patrol efforts were suspended due to lack of suspect information.

Early the next morning, Saturday the 15th, Mr. Good received an email that a subscription for "Maxim" magazine was ordered for Miss Joe Good at Blackhawk Drive. The address belonged to Mrs. Allain. On Monday the 17th of December, a subscription to "Black Men" and "Penthouse" magazines were ordered for Miss Joe Good at Bartram Village Drive. That address belonged to Ms. Love.

After attorneys for Mr. Good filed an alibi defense in the domestic battery case, the State Attorney's Office [f]iled an Announcement of No Information on Tuesday the 18th in St. Johns County Case No. 2012-02461MM.

Following a contested hearing on Wednesday the 19th, [Blazejowski] was granted an injunction for one year against Mr. Good in Case No. 2012-1712DR.

On Thursday the 27th of December, Ms. Caroline Good reported to the Jacksonville Sheriff's Office that someone mysteriously placed a container with drugs and paraphernalia in her vehicle while she was at the Avenues Mall. Writings in notebooks seized from [Blazejowski] indicate that she was planning a very similar set up.

On Monday the 31st of December, [Blazejowski] returned to Duval County in another attempt to get Mr. Good arrested for a violation of injunction. This time she reported that she was at Dicks Sporting

Goods and returned to find a card with a photo from Mr. Good. Mr. Good was questioned at work and coworkers confirmed his alibi. Mr. Good reported that he had resorted to getting a new phone that could track his movements through GPS. [Blazejowski] was later advised about making a false report, and in response she reported that she has gotten nowhere filing charges with St. Johns County but maybe she will get somewhere with Duval County.

### January 2013

On January the 11th, the Jacksonville Aviation Authority received a Crime Stoppers tip that Mr. Good was trafficking illegal drugs from Washington DC to Florida. The tip included a photo and indicated that he would have a travel companion. Two days later, as they returned from their trip, Mr. Good and Ms. Mariela Murphy were detained in the airport. A search revealed no illegal drugs. Mr. Good advised that he received a message from Yahoo while he was out of town that someone was attempting to recover his account password and that [Blazejowski] may have discovered that he was in DC because the two previously shared an Expedia account. Text messages on [Blazejowski's] phone indicate that she had been following Mr. Good around this time and that she knew he was at the airport on the 10th with a female companion.

On Wednesday the 16th of January, the Florida Division of Insurance Fraud received an anonymous report that Mr. Good was committing insurance fraud with his ex-wife, Ms. Love. The "anonymous" report came from [Blazejowski's] email at tlb1aze6@hotmail.com.

A week later, on Wednesday the 23rd, Ms. Allain reported to Deputy Romer that a red rose was sent to her house with a card that read: "*It was so good to hear your voice again. I love you, Joe.*" Mr. Good denied sending the rose and card.

7

### February 2013

[Blazejowski] then began harassing Mr. Good's new girlfriend, Ms. Mariela Murphy. On the 27th of February, [Blazejowski] sent a harassing letter to Ms. Murphy's parents in California. The envelope had her old address and it contained a photo of an undressed lady with a letter proclaiming "*MARIELA VERONICA KAPLAN MURPHY GOOD A HO!!!*" Also on the 27th, [Blazejowski] sent a harassing letter to Ms. Murphy's landlords. The handwritten envelope[] to Mr. and Mrs. Duggan contained a typed letter warning:

> *The Turnberry neighborhood is seriously concerned about your property at 280 Edge of Woods Rd. This is a nice community and your tenant is ruining it and upsetting many families. There have been countless complaints about the late night teen parties thrown by her daughter while she is out of town. These parties always involve drugs and alcohol out in the open for children to see. The most upsetting and what you should be most concerned about is that she constantly has her boyfriend Joseph Good who is a criminal, recently arrested in St. Johns County spend days at a time at the house. We also believe that your property is in danger. Prior to living with Mariela Murphy, Joseph Good dated a women* [sic] *who was the victim of his jealous ex-wife, Beth Ann Love who vandalized her home by spray painting profanity all over* [ ] *her house and then went to Turnberry and did the same to his house on Paradise Pond Rd. Please verify this though* [sic] *the neighborhood security company. It won't be long before your property is targeted and you both also become victims.*

Writings in a notebook seized from [Blazejowski] indicate that she authored the letters ("2/27/13 ... *mailed letter to her landlords faked handwriting on envelope and did not handle anything with hands uncovered*").

[Blazejowski] then turned to using crime stoppers as a medium for harassment and threats. On

8

the 27th of February, she called Crime Stoppers of Northeast Florida to report that Mr. Good was sexually molesting certain minor children. The anonymous report mentioned Mrs. Allain and claimed that abuse had been ongoing since September 2012. The report was updated on March 1st to include that "*the suspect got a new phone, so the pictures might be on the old phone or on his computer.*" [Blazejowski] documented in a red notebook that on "02/27/13: *Reported Joe . . . by calling crime stoppers.*"

### March 2013

[Blazejowski] began March with a blitz of more false reports made anonymously through crime stoppers. On March 1st, [Blazejowski] made an anonymous report to First Coast Crime Stoppers that Mr. Good and Mr. Thomas were storing child pornography on their work computers and using women to obtain access to children. The tip also implicated Ms. Murphy, Mrs. Allain, Mrs. Robor, and Ms. Good. An investigation by All State and the Jacksonville Sheriff's Office revealed that the tip was unfounded.

Also on the 1st of March, [Blazejowski] made widespread accusations to the National Center for Missing & Exploited Children (NCMEC) about child molestation and pornography. She named six children as victims, and falsely implicated Mr. Good, Mr. Thomas, Mrs. Robor, H.G. (a minor), Ms. Good, and Ms. Murphy as suspects. The narrative of the NCMEC tip is identical to the First Coast Crime Stoppers tip also sent that day. Records reveal that the NCMEC tip was made from an IP address (208.96.17795) registered to [Blazejowski].

On March the 2nd, [Blazejowski] anonymously made an additional crime stopper report that Mr. Good was molesting a minor child that was also threatening suicide. The tip implicated Ms. Murphy.

On March the 4th, Deputy Kelly responded to the St. Augustine Outlet Mall regarding a threat to kill [Blazejowski] allegedly made by "Mariela."

9

[Blazejowski's] coworker at the Disney Store, Ms. Rose Carey, reported that she received a call from "Mariela" warning that her and Joe were coming down there to kill [Blazejowski]. Ironically, [Blazejowski] arrived five minutes later. Per [Blazejowski], the Sheriff's Office responded to her house earlier that day in reference to a report made by Ms. Murphy. Both Mr. Good and Ms. Murphy denied any involvement. No arrests were made but affidavits were obtained with Mr. Good's new number and Ms. Murphy's number listed. Writings from the red notebook indicate this was another fabrication by [Blazejowski].

Now armed with their new contact information, [Blazejowski] engaged in a campaign of fabricated violations of injunctions by repeatedly spoofing her cell phone. On Monday the 11th, [Blazejowski] met with SJSO Deputy Banks at McDonalds on State Road 16 to report that Ms. Murphy and Mr. Good were harassing her. [Blazejowski] alleged that she received four calls from around 8:20 pm. She alleged that on the third call a woman said "*don't fall asleep tonight*" and on the fourth call a man said "*coming for you.*" [Blazejowski] claimed that she recognized Mr. Good's voice on the fourth call. She additionally provided an email from "Mariela Murphy" at marielaymurphy@gmail.com with the subject "*Watch your back*" and message:

> *Working tonight? LOL You're all so stupid. ESPECIALLY THE COPS!! They will never figure out what we did but you will take the fall. Cops and gates won't protect you. We know where you are at all times and if we don't get you at work Joe knows how to get into your house. Joe wants me to be Mrs. Good but he says we can't move on until you arc dead. Therefore, when you least expect it we will get you and no one will ever find your body. Kiss your kids goodbye!!!*

No arrests were made. Records show that marielaymurphy@gmail.com was created that morning from an IP address (173.8.61.53) registered to the Bartram Trail Library.

10

Three days later, on the 13th of March, [Blazejowski] reported to Deputy Kelly that she received 13 calls from 315-2997 and on the final call at 11:20 pm, Mr. Good left a voicemail stating, "*I will call you later*." Deputy Kelly arrested Mr. Good that night for a violation of injunction because the number depicted on [Blazejowski's] phone matched the number on Mr. Good's affidavit from March the 4th. By 1:56 am on the morning of the 14th, Mr. Good was booked into the St. Johns County Jail for a second time.

Within an hour of second false arrest, [Blazejowski] registered a group of people for the Florida Victim Information and Notification Everyday (VINE) service so that they would be notified of Mr. Good's arrest and release. Included on the list was Mr. Good (via cjmxg@allstate.com), Ms. Good, Ms. Murphy, Mr. Duggan, Mr. Thomas (via cdc5b@allstate.com), president@allstate.com, and various St. Johns County school administrators or coaches. Evidence seized from [Blazejowski] includes a checklist of the people that were subscribed for the service.

After Mr. Good posted bond, [Blazejowski] called the Sheriff's Office on the evening of the 14th of March to report another violation of injunction. This time Deputy Wright responded to [Blazejowski's] house around 9:34 pm and collected a sworn affidavit from her stating that:

> *At approximately 16:26 tonight I received a phone call from (904) 315-2997. I did not answer the call but a voice mail was left by a voice I recognize as my ex-fiancé Joseph Good saying "You will die for making me go to jail."*

[Blazejowski] added that she received notice from the jail that Mr. Good had been released prior to the threatening message. Mr. Good was not arrested due to an ongoing investigation in this case by the Sheriff's Office.

[Blazejowski] then went to Duval County the following day and reported the same alleged violation

of injunction. On Friday the 15th, [Blazejowski] advised Deputy Bennick that she listened to a call at 11:30 am while in Duval County at an appointment. She elaborated that she received the call on the 14th at 16:27 hours while she was in Duval County, and further that it was made by Mr. Good while he was at work in Duval County. The alleged voicemail stated: "*You will die for making me stay the night in jail.*" JSO did not make an arrest that day.

Phone records reveal that [Blazejowski] fabricated the alleged violations of injunction by spoofing her cell phone on the 11th, 13th, and 14th. Records from Sprint for [Blazejowski] show that: (a) five calls were received on the 11th from Ms. Murphy's phone between 19:58 hours and 20:23 hours; (b) a total of 13 calls were received on the 13th from Mr. Good's phone between 21:40 hours to 23:20 hours, and (c) one call was received on the 14th from Mr. Good's phone at 16:26 hours. Records from AT&T however prove that in fact no calls were made by Ms. Murphy to [Blazejowski] on the 11th and no calls were made by Mr. Good to [Blazejowski] on either the 13th or 14th.

On the 17th of March, [Blazejowski] wrote a letter to SJSO Commander Art May and Sheriff David Shoar commending Deputy Galentine, Deputy Kelly, Sergeant Tarbert, and Deputy Wright for their work. In the letter she portrays herself as "*a scared victim.*"

On Wednesday the 20th of March, [Blazejowski] reported another violation of injunction in Duval County. [Blazejowski] reported to JSO Deputy Snead that she received to [sic] voicemail messages from Mr. Good stating that[] "*You fucking cunt, I still have a gun*" and "*I should have killed you when I had the chance. Good thing it's never too late.*" [Blazejowski] alleged that the calls came from his work phone (904-223-2704) at 11:40 am and 11:43 am while she was in Duval County. An arrest warrant was then issued at the request of the State Attorney's Office in Duval County. On the following day, while he was at work in Jacksonville, Mr. Good was falsely arrested for a third time.

Records from Sprint for [Blazejowski] (392-8423) show that two calls were made from Mr. Good's work phone (223-2704) on the 20th at 11:39 am and 11:42 am. Records from All State reflect that no calls were made but records from AT&T reflect that four calls were made. Notwithstanding the discrepancy in the records, the recorded messages were clearly computer generated and clearly not recognizable as Mr. Good's voice. The same messages were also written in a red notebook used by [Blazejowski] to organize and plan her attacks. Moreover, the notes confirm that [Blazejowski] discovered a way to spoof calls from his work phone "*to get Joe fired.*"

On Thursday the 28th, [Blazejowski] called in an anonymous report to the Florida Department of Children and Families regarding child neglect and abuse by Mr. Good and his ex-wife, Ms. Love. Caller ID displayed [Blazejowski's] phone number (392-8423). An investigation by DCF proved that the tip was unfounded. At the direction of Detectives with the Sheriff's Office, DCF confirmed through a controlled call that [Blazejowski] made the "anonymous" report.

On the 31st of March, [Blazejowski] registered Mr. Good for multiple adult dating websites online. [Blazejowski] also created a fake Facebook account for Mr. Good. Records from Facebook reveal that [Blazejowski] used her cell phone (392-8423) to verify the account and accessed the account from an IP address (208.96.177.95) registered to her house. During this time, Mrs. Robor received a message from the account with a "profile" of Mr. Good that contained a copy of his All State business card, booking photos from his false arrests, a phot[o] of him undressed, and the slogan "*you are in good hands when you get fucked Joe Good.*" A search of [Blazejowski's] computer exposed how she created the "profile" that she later posted online and mailed to various persons.

## April 2013

On April the 2nd, [Blazejowski] made two more unjustifiable complaints to Crime Stoppers of

Northeast Florida. The first tip (#W326-3262), made at 12:52 am[] [w]as very similar to the one made a month earlier in March because it again alleged that a certain child was threatening suicide because she was being sexually abused. The tip implicated both Mr. Good and Ms. Murphy. The second tip (#W326-3263), made at 1:02 am, alleged that Mr. Good and Mrs. Robor were engaged in pornographic photography of children. Writings seized from [Blazejowski] reveal that she made both of these false accusations.

Also on April the 2nd, [Blazejowski] circulated a vulgar letter to Ms. Murphy, Ms. Allain, and Mr. Good's mother. The mailing had the same "profile" that was sent to Mrs. Robor via Facebook along with a list of adult websites that it could be found on.

Also on the 2nd, [Blazejowski] sent Ms. Murphy a peculiar letter warning:

> "*HI BITCH STOP MESSING W/ Beth She actually wants to make peace w you! LOL Your beef is with me Not her Leave her alone OR DEAL WITH <u>ME</u>. You R SO STUPID! Do U Really think that he will stay w you? Only For the sex … Stay away from my friend. Or else "Your Friend" NOT!*"

Two days later, on the 4th of April, [Blazejowski] continued the harassment with a malicious letter to Ms. Murphy's ex-husband at his work. The letter was filled with accusations of incest, child abuse, child pornography, and child suicide. Later that evening, [Blazejowski] registered Mrs. Robor for multiple adult websites and adult store catalogs.

The terror caused by [Blazejowski] escalated on Friday the 5th of April when she sent a second round of threatening letters. The Defendant sent a letter to both of Ms. Murphy's parents in California with a photo of a decomposing corpse and threat that:

> "THIS IS WHAT [**REDACTED**] WILL LOOK LIKE THE NEXT TIME MARIELA SEE'S HER IF SHE SEE'S OR EVENT TALKS TO JOE GOOD ONE MORE TIME!"

[Blazejowski] additionally sent a frightening letter to Ms. Murphy's landlord, Mr. Duggan, with the threat that:

*IF MARIELA MURPHY IS NOT OUT OF' YOUR RENTAL PROPERTY WITHIN 30 DAYS 280 EDGE OF WOODS RD AND 229 PINEHURST POINT ST. AUGUSTINE, FL 32092 WILL BOTH BURN TO THE GROUND!!!*

[Blazejowski] also sent a letter to the corporate office of All State warning that:

"*SOME PEOPLE JUST SHOULDN'T LEAVE THEIR EMAIL UP ON THEIR SCREEN AND WALK AWAY FROM THEIR DESK. MAYBE NOW YOU WILL SEE WHAT MANY HAVE BEEN TRYING TO TELL YOU FOR SO LONG ABOUT JENNY ROBOR AND JOE GOOD!!!!*"

That day also included a fax sent by [Blazejowski] at Office Depot to All State under the disguise that it was "*from Mariela Murphy to Jenny Robor*." Attached to the fax was a string of fake emails that appear as if they were secretly sent between Mr. Good and Mrs. Robor.

Twelve days later, on the 17th of April, [Blazejowski] was apprehended by the St. Johns County Sheriff's Office as they executed a search warrant at her home. Deputies seized an overwhelming amount of evidence detailing [Blazejowski's] course of conduct in this case.

In [Blazejowski's] house, Deputies located a red college ruled "1 subject" notebook and a yellow "memo book." Among other things, the red notebook contained a chronology of the fraudulent reports that she made and the threatening letters that she sent from February to April. The yellow memo book included notes that prove [Blazejowski] created the death threat letter that was sent to Ms. Murphy's parents a few days earlier ("*send letter to Mariela's step mother*" and "*get picture of decomposed corpse*").

In [Blazejowski's] car, Deputies discovered the original fax she sent to All State two days earlier from

15

Office Depot. They also found a multicolored notebook which verified that [Blazejowski] was trying to engineer an aggravated stalking case against Mr. Good ("*space actions a month apart to show a pattern of aggravated stalking*"). The multicolored notebook further verified that [Blazejowski] was attempting to create "*provable violations*" that would get Mr. Good arrested and fired from his job ("*after all this make sure to get a Duval judge change 1 yr. injunction to permanent*").

In the end, [Blazejowski's] actions caused Mr. Good to be falsely arrested three times and then wrongfully terminated from his job at All State after more than 20 years there.

See Doc. 13-1 at 108-23.

On August 15, 2013, the State of Florida (State) charged Blazejowski by amended information with three counts of threats or extortion (counts 1-3), four counts of aggravated stalking (counts 4-7), and one count of false report of child abuse, abandonment or neglect (count 8). See Doc. 13-1 at 6-7. On August 14, 2014, Blazejowski entered an open plea of no-contest to all eight counts. See id. at 9-15. On October 10, 2014, the trial court sentenced Blazejowski to nine years imprisonment followed by two years of community control and then four years of probation on counts 1 through 3; five years imprisonment on count 4; and five years of probation on each of the remaining counts (counts 5-8). Id. at 50-58. The trial court also entered an Order of Community Control/Probation the same day, which set forth all of the conditions of

Blazejowski's community control and probation. Id. at 58-66. Blazejowski did not pursue a direct appeal.

On February 18, 2016, Blazejowski filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 (Rule 3.850 Motion). Id. at 106-33. In the Rule 3.850 Motion, Blazejowski argued her trial counsel was ineffective when he advised her to forego the State's alleged plea offer of two to three years imprisonment and instead enter an open no-contest plea. Id. After holding an evidentiary hearing, the postconviction court denied relief on July 21, 2017. Id. at 183-92. The Fifth District Court of Appeal (Fifth DCA) per curiam affirmed the denial of relief on June 26, 2018, and issued the mandate on July 20, 2018. Id. at 433, 435.

In May 2018, while serving her prison sentence, Blazejowski was charged with violating a special condition of the community control/probation order that prohibited her from contacting the victims. Id. at 60-61, 475-77. After conducting a violation of probation (VOP) hearing, the trial court revoked Blazejowski's community control/probation on counts 1 through 3 and resentenced her to "serve fifteen (15) years in prison, concurrent on those counts," with the probationary sentences on counts 5 through 8 to "remain unchanged." Id. at 606-08, 611. Blazejowski appealed, see Doc. 13-2 at 164-211, and on February 4, 2020, the Fifth DCA per curiam affirmed Blazejowski's

17

judgment and sentence upon violation of probation, id. at 252. The Fifth DCA issued the mandate on April 27, 2020. Id. at 285.

Blazejowski subsequently filed a petition for writ of prohibition seeking to disqualify the state court judge who presided over the VOP proceeding. See Doc. 13-2 at 294-306. The Fifth DCA denied the petition on May 19, 2020. Id. at 315.

On July 8, 2020, Blazejowski filed a successive Rule 3.850 motion (Successive Rule 3.850 Motion) in which she raised three claims: (1) newly discovered evidence; (2) sentence manipulation; and (3) use of false testimony by the State. See Doc. 13-3 at 257-304. The postconviction court denied relief on May 25, 2021. See Doc. 13-4 at 499-521. The Fifth DCA per curiam affirmed the denial of relief on September 21, 2021, id. at 523, and issued the mandate on October 15, 2021, id. at 525.

While her Successive Rule 3.850 Motion was pending, Blazejowski filed a petition for writ of certiorari, which she later amended. See Doc. 13-2 at 329-61. On December 17, 2020, the Fifth DCA dismissed the amended petition after Blazejowski failed to comply with the court's order directing her to submit an appendix in accordance with the requirements of Federal Rule of Appellate Procedure 9.220. Id. at 363, 365.

Blazejowski filed the instant action under 28 U.S.C. § 2254 on December 2, 2020. See Doc. 1.

18

### III. One-Year Limitations Period

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) imposes a one-year statute of limitations on petitions for writ of habeas corpus. Specifically, 28 U.S.C. § 2244 provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is

pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d). As Blazejowski's convictions and sentence became final after the effective date of AEDPA, this habeas action is subject to the one-year limitations period. See 28 U.S.C. § 2244(d)(1).

Respondents argue that this action is untimely as to the five grounds raised in the Amended Petition that challenge the original 2014 judgment and sentence. See Response at 10-11. As to those five grounds, Respondents contend the one-year limitations period began to run from the date the original 2014 judgment and sentence became final. Id. Blazejowski disagrees, arguing that all grounds raised in the Amended Petition are timely because she filed this action within one year of the date her 2018 judgment after revocation of probation became final. See Reply at 5.

"AEDPA's statute of limitations runs from the date the judgment pursuant to which the petitioner is in custody becomes final, which is the date both the conviction and sentence the petitioner is serving become final." Ferreira v. Sec'y, Dep't of Corr., 494 F.3d 1286, 1288 (11th Cir. 2007). "[T]he judgment that forms the basis of the habeas petition is the one that places the petitioner in custody." Id. at 1292; Patterson v. Sec'y, Fla. Dep't of Corr., 849 F.3d 1321, 1325 (11th Cir. 2017) ("The judgment that matters for purposes of section 2244 is the judgment authorizing the prisoner's confinement.")

20

(internal quotation marks and citation omitted). Thus, the Court looks to the judgment that places Blazejowski in custody. Here, that judgment is the 2018 violation of probation judgment. Though that judgment stems from the 2014 original judgment and sentence, the sentence that authorizes Blazejowski's current detention is the sentence imposed in 2018 for violation of probation. See Ferreira, 494 F.3d at 1292 (stating that "the judgment to which AEDPA refers is the underlying conviction and most recent sentence that authorizes the petitioner's current detention"); see also Reilly v. Sec'y, Fla. Dep't of Corr., No. 21-13668, 2023 WL 7179321, at *3 (11th Cir. Nov. 1, 2023) (The "judgment [for § 2244 purposes] is the 2015 violation of probation judgment. Though that 2015 judgment stems in part from the 2009 judgment, the sentence that authorized [the petitioner's] current detention is the sentence imposed in 2015 for his violation of probation."); Hernandez v. Sec'y, Dep't of Corr., No. 3:12-cv-377-BJD-PDB, 2015 WL 224654, at *4 (M.D. Fla. Jan. 15, 2015) (finding the petitioner's "conviction and sentence became final [for AEDPA purposes] after revocation of the probation and the imposition of the new judgment and sentence").[2] Accordingly, the August 21, 2018 order of revocation and

---

[2] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

imposition of a new judgment and sentence constitutes the "judgment" that determines the timeliness of Blazejowski's claims under § 2244(d)(1)(A).[3] Respondents concede that "the entire § 2254 petition is timely" if the one-year limitations period began to run when Blazejowski's August 21, 2018 judgment and sentence from the violation of probation became final. See Response at 11.

The Fifth DCA per curiam affirmed the 2018 judgment on February 4, 2020, and issued the mandate on April 27, 2020. See Doc. 13-2 at 257, 285. Because Florida law does not permit the Florida Supreme Court to review an affirmance without an opinion, see Florida Rule of Appellate Procedure 9.030(a)(2), Blazejowski's judgment and sentence became final when the time for filing a petition for certiorari review in the United States Supreme Court expired. See Chamblee v. Florida, 905 F.3d 1192, 1198 (11th Cir. 2018). The time for Blazejowski to file a petition for writ of certiorari expired on Monday, May 4, 2020 (ninety days after February 4, 2020). See Chavers v. Sec'y, Fla. Dep't of Corr., 468 F.3d 1273, 1275 (11th Cir. 2006) (affording the 90-day grace period to a Florida petitioner whose conviction was affirmed by a court of appeal in an unelaborated per curiam decision). Accordingly, Blazejowski had until May 4, 2021, to file a federal habeas petition. Because she filed this

---

[3] Blazejowski does not allege, nor does it appear from the pleadings or the record, that the statutory triggers set forth in §§ 2244(d)(1)(B)-(D) apply in this case.

22

habeas action on December 2, 2020,[4] the Court concludes that her Amended Petition is timely filed.

## IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Blazejowski's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

---

[4] See Houston v. Lack, 487 U.S. 266, 276 (1988) (mailbox rule).

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), abrogation recognized on other grounds by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'" Id. (internal quotation marks omitted) (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

24

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97-98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

25

> law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.
>
> Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

26

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

## B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

27

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state
> prisoner must exhaust available state remedies, 28
> U.S.C. § 2254(b)(1), thereby giving the State the
> ""opportunity to pass upon and correct" alleged
> violations of its prisoners' federal rights.'" Duncan v.
> Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d
> 865 (1995) (per curiam) (quoting Picard v. Connor, 404
> U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To
> provide the State with the necessary "opportunity,"
> the prisoner must "fairly present" his claim in each
> appropriate state court (including a state supreme
> court with powers of discretionary review), thereby
> alerting that court to the federal nature of the claim.
> Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan
> v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144
> L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies
results in a procedural default which raises a potential bar to federal habeas
review. The United States Supreme Court has explained the doctrine of
procedural default as follows:

> Federal habeas courts reviewing the constitutionality
> of a state prisoner's conviction and sentence are guided
> by rules designed to ensure that state-court judgments
> are accorded the finality and respect necessary to
> preserve the integrity of legal proceedings within our
> system of federalism. These rules include the doctrine
> of procedural default, under which a federal court will
> not review the merits of claims, including
> constitutional claims, that a state court declined to
> hear because the prisoner failed to abide by a state

> procedural rule. See, e.g., Coleman,[5] supra, at 747–
> 748, 111 S. Ct. 2546; Sykes,[6] supra, at 84–85, 97 S.
> Ct. 2497. A state court's invocation of a procedural
> rule to deny a prisoner's claims precludes federal
> review of the claims if, among other requisites, the
> state procedural rule is a nonfederal ground adequate
> to support the judgment and the rule is firmly
> established and consistently followed. See, e.g.,
> Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–
> 1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558
> U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417
> (2009). The doctrine barring procedurally defaulted
> claims from being heard is not without exceptions. A
> prisoner may obtain federal review of a defaulted
> claim by showing cause for the default and prejudice
> from a violation of federal law. See Coleman, 501 U.S.,
> at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Thus, procedural defaults may

be excused under certain circumstances. Notwithstanding that a claim has

been procedurally defaulted, a federal court may still consider the claim if a

state habeas petitioner can show either (1) cause for and actual prejudice from

the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d

1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

> the procedural default "must result from some
> objective factor external to the defense that prevented
> [him] from raising the claim and which cannot be
> fairly attributable to his own conduct." McCoy v.
> Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992)
> (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[7]
> Under the prejudice prong, [a petitioner] must show

---

[5] Coleman v. Thompson, 501 U.S. 722 (1991).

[6] Wainwright v. Sykes, 433 U.S. 72 (1977).

[7] Murray v. Carrier, 477 U.S. 478 (1986).

> that "the errors at trial actually and substantially
> disadvantaged his defense so that he was denied
> fundamental fairness." Id. at 1261 (quoting Carrier,
> 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may

receive consideration on the merits of a procedurally defaulted claim if the

petitioner can establish that a fundamental miscarriage of justice, the

continued incarceration of one who is actually innocent, otherwise would

result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice,
> there remains yet another avenue for him to receive
> consideration on the merits of his procedurally
> defaulted claim. "[I]n an extraordinary case, where a
> constitutional violation has probably resulted in the
> conviction of one who is actually innocent, a federal
> habeas court may grant the writ even in the absence
> of a showing of cause for the procedural default."
> Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This
> exception is exceedingly narrow in scope," however,
> and requires proof of actual innocence, not just legal
> innocence. Johnson v. Alabama, 256 F.3d 1156, 1171
> (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that

it is more likely than not that no reasonable juror would have convicted him'

of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir.

2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be

credible,' a claim of actual innocence must be based on reliable evidence not

presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As Ground One, Blazejowski argues the State manufactured evidence against her in order to prevent her from testifying in an unrelated murder that she alleges was committed by a St. Johns County Sheriff's Office deputy. See Amended Petition at 6-17. Initially, the Court finds that Blazejowski fails to present an identifiable constitutional claim in Ground One for which federal habeas relief would lie. Instead, Blazejowski appears to raise only issues of state law which are not cognizable in a federal habeas proceeding. See Estelle v. McGuire, 502 U.S. 62, 67 (1991) (stating that "federal habeas corpus relief does not lie for errors of state law").

Even assuming Blazejowski presents a federal constitutional challenge in Ground One, the claim is procedurally barred because she did not fairly present the federal nature of her claim to the state court. The record reflects that Blazejowski raised this claim as a newly discovered evidence claim in her Successive Rule 3.850 Motion. See Doc. 13-3 at 257-64. Her argument, however, consisted solely of a factual narrative regarding the murder and the

31

alleged manufacturing of evidence against her. Id. Blazejowski did not present any federal constitutional grounds in support of her claim. Therefore, to the extent Blazejowski now raises a federal claim, the Court finds she failed to alert the state court to the federal nature of her claim, and in failing to do so, deprived the state court of a meaningful opportunity to review the claim. See Baldwin, 541 U.S. at 29; see Kelley v. Sec'y, Dep't of Corr., 377 F.3d 1317, 1345 (11th Cir. 2004) (a petitioner cannot "scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick.").

Further, Blazejowski is also procedurally barred from seeking federal habeas relief on this claim because the postconviction court relied on an independent and adequate state procedural ground when it found the claim untimely under Florida Rule of Criminal Procedure 3.850(b). See Doc. 13-4 at 509-13. The Eleventh Circuit has established a three-part test to determine when a state court's procedural ruling relies on an independent and adequate state ground. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). "First, (1) the last state court rendering judgment must clearly and expressly state it is relying on a state procedural rule to resolve the federal claim. . . . Second, the state court's decision on the procedural issue must rest entirely on state law

grounds and not be intertwined with an interpretation of federal law. . . . Third, the state procedural rule must be adequate." Id. (citations omitted and emphasis added).

As applied here, the postconviction court's untimeliness finding was based on the procedural requirements of Rule 3.850, which is an independent and adequate state procedural ground. See LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1260 n.25 (11th Cir. 2005) ("[T]he procedural requirements of Florida's Rule 3.850 constitute independent and adequate grounds under the applicable law."); Kimbrough v. Sec'y, Fla. Dep't of Corr., 809 F. App'x 684, 692-93 (11th Cir. 2020) (holding the denial of a claim as untimely under Rule 3.850(b) "rested on an independent and adequate state procedural ground"). Second, the postconviction court's untimeliness determination rested solely on state procedural grounds without citing to or otherwise referencing federal law. Thus, the postconviction court's "ruling was not intertwined with federal law." Kimbrough, 809 F. App'x at 692.

Third, the procedural rule was adequate to support the postconviction court's untimeliness finding. See id. That is, the postconviction court properly applied a regularly followed procedural default principle to find the claim untimely. A Rule 3.850 motion for postconviction relief must be filed within two years of the criminal judgment "unless the motion alleges that the facts on which the claims for relief are predicated could not have been discovered

33

earlier by the exercise of due diligence." See Kimbrough, 809 F. App'x at 692

(citing Fla. R. Crim. P. 3.850(b)(1)). Here, the postconviction court determined

that Blazejowski's allegations regarding the manufacturing of evidence were

not newly discovered as the record showed she was aware of them as early as

March 2014 -- approximately five months before she entered her no-contest

plea. See Doc. 13-4 at 513. The postconviction court explained:

> Defendant alleges that "all details were intentionally
> and knowingly kept form [sic] the defense team until
> 2019." However, in the March 21, 2014 Affidavit
> attached to Defendant's motion as part of Exhibit 6,
> she alleged that "the entire St. Johns County judicial
> system knew that Srgt. David Tarbert was not only
> involved but responsible for the crimes that
> [Defendant] was being accused of." In the affidavit,
> Defendant maintained that during the execution of the
> search warrant at her home, the officers informed her
> they "found evidence of [Sgt.] Tarbert's involvement."
> Defendant alleges that the St. Johns County Sheriff's
> Office and State Attorney's Office withheld this
> evidence in their discovery disclosures. Additionally,
> in her 2016 Florida Bar Complaint, which is also part
> of Exhibit 6 to her motion, Defendant alleged that
> Assistant State Attorney France and Sgt. Tarbert
> manufactured   the   instant   case   against   her.
> Accordingly, the "evidence" is not newly discovered,
> and Defendant's present claim is untimely as the
> record reflects she was aware of the aforementioned
> information in March 2014. Finally, the Court
> observes that Defendant's present allegations indicate
> she was aware of Sgt. Tarbert and Assistant State
> Attorney France's scheme to frame her prior to
> entering her plea. However, during the plea colloquy,
> the Court asked Defendant whether "anybody coached
> you or told you to testify falsely because of any promise
> or understanding which has not been told to me," to

> which Defendant responded in the negative. For these
> reasons, the Court finds the instant claim of newly
> discovered evidence fails.

See Doc. 13-4 at 512-13 (emphasis added). Accordingly, the claim is procedurally barred as the postconviction court's decision rested on an independent and adequate state law ground.

Blazejowski has not shown either cause excusing the default or actual prejudice resulting from the bar. Moreover, she has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception. Accordingly, relief on the claim in Ground One is due to be denied.

## B. Ground Two

As Ground Two, Blazejowski asserts the State violated her constitutional rights to equal protection and due process when it charged her with aggravated stalking and extortion. See Amended Petition at 17-18. Blazejowski raised a substantially similar claim in her amended petition for writ of certiorari, which the Fifth DCA dismissed on procedural grounds due to her failure to file an appendix as ordered. See Doc. 13-2 at 348, 357-58, 365. She also raised the claim in her Successive Rule 3.850 Motion as a claim of "sentence manipulation." See Doc. 13-3 at 268-69. The postconviction court found the claim untimely and successive. See Doc. 13-4 at 520. The Fifth DCA affirmed without a written opinion. Id. at 523.

Respondents contend, and the Court agrees, that the claim in Ground Two is procedurally defaulted. See Doc. 13 at 15. Blazejowski has not shown either cause excusing the default or actual prejudice resulting from the bar. Moreover, she has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception. Accordingly, the claim in Ground Two is due to be denied.

## C. Ground Three

As Ground Three, Blazejowski asserts Detective Andrews of the St. Johns County Sheriff's Office violated the Fourth Amendment by intentionally including false statements in the search warrant affidavit. See Amended Petition at 20-37. She further asserts Detective Andrews' conduct resulted in violations of Brady v. Maryland, 372 U.S 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). See Amended Petition at 20, 36-37.

To the extent Blazejowski asserts a Fourth Amendment claim or Brady and Giglio violations, the Court finds her claims are unexhausted because she failed to raise them in her direct appeal or in her postconviction filings.[8] Since future attempts to exhaust these claims would be futile, the claims are

_____

[8] The Court notes that Blazejowski's factual allegations in Ground Three were taken almost verbatim from her "sentence manipulation" claim in her Successive Rule 3.850 Motion. See Doc. 13-3 at 269-79. She did not, however, assert any of the federal claims she now raises in Ground Three of the Amended Petition. Even if she had done so, the postconviction court denied the sentence manipulation claim as untimely and successive. Thus, the claim would have been procedurally defaulted for the reasons set forth in Grounds One and Two.

procedurally defaulted. Blazejowski has alleged neither cause and prejudice nor a miscarriage of justice to overcome her failure to exhaust. Thus, she is not entitled to federal habeas relief on the claims raised in Ground Three.

### D. Ground Four

Next, Blazejowski asserts her due process rights were violated because she was not provided written notice of the conditions of her probation. See Amended Petition at 40-45. She raised this claim in her amended petition for writ of certiorari, which the Fifth DCA dismissed on procedural grounds. See Doc. 13-2 at 332, 347-48. She also raised this claim in a Florida Rule of Criminal Procedure 3.800 motion. At the time she commenced this federal habeas action, the Rule 3.800 motion was still pending. See Doc. 13-4 at 527-32. The postconviction court has since denied the motion, stating in relevant part:

> [A]lthough Defendant's motion contains multiple citations to cases indicating a court must orally pronounce special conditions of probation, this Court observes that all special conditions, including special condition 11 which prohibited contact with the victims in the present case, were orally pronounced at sentencing.

See State v. Blazejowski, No. 2013-CF-645 (Fla. 7th Cir. Ct. May 12, 2023).

The Fifth DCA per curiam subsequently affirmed the denial of relief.[9] Id.

Assuming the claim was properly exhausted, the Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. Thus, Blazejowski is not entitled to federal habeas relief on this claim.

Nevertheless, even if the state court's adjudication of the claim is not entitled to deference, the claim is without merit. The record wholly refutes Blazejowski's assertion that she did not have written notice of the conditions of her probation. During the sentencing hearing, the trial court orally advised Blazejowski of the special conditions of her community control and probation,

_____

[9] The Fifth DCA also included language in its order cautioning Blazejowski: This Court previously affirmed [Blazejowski's] direct appeal and thereafter, dismissed several petitions and appeals filed in this Court stemming from St. Johns County Circuit Court Case No. 2013-CF-645. Because it appears that [Blazejowski's] filings are abusive, repetitive, malicious, or frivolous, [Blazejowski] is cautioned that any further pro se filings in this Court asserting claims stemming from St. Johns County Circuit Court Case No. 2013-CF-645, may result in sanctions such as a bar on pro se filing in this Court. See State v. Spencer, 751 So. 2d 47 (Fla. 1999).
See State v. Blazejowski, No. 2013-CF-645 (Fla. 7th Cir. Ct. Dec. 14, 2023).

including in pertinent part, the requirement that she was to have no contact with the victims "during the entire time of [her] imprisonment and probation." Doc. 13-3 at 216. The trial court also entered an Order of Community Control/Probation the same day that set forth all conditions. See Doc. 13-1 at 58-66. Thus, Blazejowski is not entitled to relief on the claim in Ground Four.

### E. Ground Five

As stated earlier, Blazejowski's community control/probation order included, in relevant part, a special condition prohibiting Blazejowski from contacting any of the victims. See Doc. 13-1 at 60. In 2018, the trial court revoked the community control/probation order after finding Blazejowski violated the no-contact provision by sending a subpoena and interrogatories to one of the victims, Jennifer Robor. Id. at 606-08. As Ground Five of the Amended Petition, Blazejowski asserts her contact with Robor was a legitimate exercise of her constitutionally protected right of access to the courts because she sent the documents to Robor for discovery purposes in connection with a motion to vacate an injunction.[10] See Amended Petition at 46-47. She contends the trial court failed to warn her during her plea hearing and sentencing that

---

[10] The injunction at issue was obtained by another victim, Joseph Good, after the events underlying this case occurred. See Doc. 13-2 at 151-52 (citing Good v. Blazejowski, No. DR-13-0715 (Fla. 7th Cir. Ct. Dec. 10, 2014)); see also https://apps.stjohnsclerk.com/Benchmark/Home.aspx/Search (last visited March 22, 2024). According to Blazejowski, she sought to vacate the injunction so that she could qualify for work release from prison.

it was "stripping her of her constitutional rights" to access the courts, represent herself, and confront her accusers. Id. at 46.

To the extent Blazejowski asserts she was denied the right to represent herself or to confront her accusers, the Court finds her claims are unexhausted because she failed to raise them in the state court. Since future attempts to exhaust these claims would be futile, the claims are procedurally defaulted. Blazejowski has alleged neither cause and prejudice nor a miscarriage of justice to overcome her failure to exhaust.

Insofar as Blazejowski asserts she was denied her constitutional right of access to the courts, the record reflects that she raised a substantially similar claim in her direct appeal of the 2018 judgment and sentence. See Doc. 13-2 at 194. The State filed an answer brief, id. at 214-36, and Blazejowski filed a reply brief, id. at 239-50. On February 4, 2020, the Fifth DCA per curiam affirmed the 2018 judgment and sentence without a written opinion. Id. at 252. To the extent the appellate court decided the claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of the claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence

40

presented in the state court proceedings. Thus, Blazejowski is not entitled to relief on the basis of this claim.

Nevertheless, even if the state appellate court's adjudication of the access to courts claim is not entitled to deference, the claim is without merit. Nothing in the record suggests that the state court ever imposed any restrictions on Blazejowski's right of access to the state courts. In fact, the record reflects that Blazejowski has pursued legal relief on numerous occasions subsequent to the entry of the community control/probation order. Insofar as Blazejowski argues the no-contact provision hindered her efforts to vacate the injunction, the record fully supports the trial court's conclusion that the documents she sent to Robor were improper because (1) Robor was not a party in the injunction case and (2) the interrogatories were unrelated to the grounds Blazejowski articulated in the motion to vacate. See Doc. 13-2 at 91-93; Doc. 13-1 at 570-572. Thus, even if the no-contact provision of the community control/probation order was not in place, Blazejowski still would not have been entitled to the discovery she sought from Robor. Accordingly, Blazejowski is not entitled to federal habeas relief on the claims raised in Ground Five.

## F. Ground Six

As Ground Six, Blazejowski asserts the State violated her due process rights and retaliated against her when it charged her with violating the conditions of her probation. See Amended Petition at 48-49. Blazejowski raised

a substantially similar claim in her amended petition for writ of certiorari. See Doc. 13-2 at 347-49, 356. The Fifth DCA dismissed the petition on procedural grounds due to her failure to file an appendix as ordered. Id. at 365.

Respondents contend, and the Court agrees, that the claim in Ground Six is procedurally defaulted. Because Blazejowski has not demonstrated cause and prejudice or a miscarriage of justice to excuse the default, the claim in Ground Six is due to be denied.

### G. Ground Seven

As Ground Seven, Blazejowski argues the State violated her constitutional rights by "manipulating the circumstances" and "forcing [her] to violate conditions of probation." See Amended Petition at 50. As support for her argument, Blazejowski presents an alternate version of facts regarding the circumstances that led her to contact Robor. Id. at 50-51.

As in Ground One, the Court initially determines that Blazejowski fails to present an identifiable federal constitutional claim in Ground Seven for which federal habeas relief would lie. Her general assertion that her "constitutional rights" were violated is insufficient. To the extent Blazejowski challenges the state court's grounds for revoking the community control/probation order, she is raising issues of state law that are not cognizable in a federal habeas proceeding. See Estelle, 502 U.S. at 67 (stating that "federal habeas corpus relief does not lie for errors of state law"); see

42

Billups v. Sec'y, Dep't of Corr., 2009 WL 890273, at *4 (M.D. Fla. Mar. 31, 2009) ("[S]tate prisoners' claims of error involving . . . probation, and revocation of probation or parole are matters governed by state law that are not cognizable in federal habeas corpus proceedings.") (quoting Martin v. Solem, 801 F.2d 324, 331 (8th Cir. 1986); Scott v. Sec'y, Dep't of Corr., 2010 WL 4258952, at *10 (M.D. Fla. Oct. 25, 2010) ("Whether the state judge's revocation findings meet state law requirements does not present a cognizable basis for federal habeas corpus relief.").

Even assuming the claim is properly before this Court, the claim lacks merit. Under Florida law, a community control/probation order may be revoked if a defendant violates a condition while incarcerated prior to the commencement of probation. See Stafford v. State, 455 So. 2d 385, 386 (Fla. 1984) (holding that the state court has the inherent power "to revoke an order of probation, the term of which has not yet commenced, should the court determine that the defendant probationer has been guilty of misconduct occurring subsequent to the entry of the order of probation") (quoting Martin v. State, 243 So. 2d 189, 190-91 (Fla. 4th DCA 1971)); Cason v. State, 604 So. 2d 928, 929 (Fla. 3d DCA 1992) ("Where, as here, the defendant is given a split sentence of prison time followed by a probationary period and the defendant allegedly violates a condition of probation during the prison portion of the sentence before the probation begins, the trial court may revoke the

43

defendant's probation based on such violation."); <u>Kirkland v. State</u>, 315 So. 3d 788 (Fla. 1st DCA 2021) (affirming the revocation of an order of probation where defendant violated the no-contact provision by contacting the victim while he was still serving his prison sentence prior to the commencement of the term of probation). Here, the state court had the inherent power to revoke Blazejowski's probation based on her violation of the no-contact provision even though she was still serving the prison portion of her sentence. Accordingly, Blazejowski is not entitled to relief on the claim in Ground Seven.

## H. Ground Eight

As Ground Eight, Blazejowski argues she was exercising her constitutionally protected rights to "fil[e] a motion, access[] the court, ask[] the court for redress, represent[] herself and tak[e] part in discovery" when she contacted Robor. <u>See</u> Amended Petition at 52. She asserts this legitimate exercise of her constitutional rights did not constitute harassment. <u>Id.</u> This is essentially the same argument Blazejowski raised in Ground Five of the Amended Petition. Thus, for the same reasons discussed in Ground Five, Blazejowski is not entitled to federal habeas relief on the claim raised in Ground Eight.

## I. Ground Nine

As Ground Nine, Blazejowski argues the State failed to prove in 2014 that she met all of the elements required to convict her of aggravated stalking,

44

extortion, and making false reports. See Amended Petition at 53. In turn, she contends she could not have committed a probation violation because she was serving an illegal sentence. Id. Blazejowski raised a substantially similar claim in her amended petition for writ of certiorari. See Doc. 13-2 at 332, 358-60. The Fifth DCA dismissed the petition on procedural grounds. Id. at 365.

Respondents contend, and the Court agrees, that the claim in Ground Nine is procedurally defaulted. See Doc. 13 at 30. Because Blazejowski has not demonstrated cause and prejudice or a miscarriage of justice to excuse the default, the claim in Ground Nine is due to be denied.

Nevertheless, even if the claim was properly before the Court, the claim is without merit. Blazejowski entered an open plea of no contest to the charges. Nothing in the record suggests her plea was involuntary. During the plea colloquy, Blazejowski specifically acknowledged that she was waiving her constitutional rights by entering the plea and giving up her right to appeal all matters except that of an illegal sentence or a challenge to the circumstances of the plea. Doc. 13-1 at 18. She also stated that no one had forced, threatened, or pressured her to plead guilty. Id. at 19. The State proffered an exhaustive factual basis for the plea and defense counsel stipulated there was sufficient evidence to sustain the plea. Id. at 20-36. The trial court found there was a sufficient factual basis prior to accepting the plea. Id. at 36. Thus, on this record, Blazejowski is not entitled to relief on the claim in Ground Nine.

## J. Ground Ten

As Ground Ten, Blazejowski contends the circuit court judge who presided over the VOP proceeding was prejudiced and biased against her. See Amended Petition at 54-55. She argues the judge's remarks during the VOP hearing violated her constitutional rights to due process and a fair trial. Id. Blazejowski raised a substantially similar claim in her petition for writ of prohibition, which the Fifth DCA denied. See Doc. 13-2 at 297-305, 315.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. Thus, Blazejowski is not entitled to relief on the basis of this claim.

Nevertheless, even if the state court's adjudication of the claim is not entitled to deference, the claim is without merit. The Due Process Clause guaranteed Blazejowski "a fair trial in a fair tribunal, before a judge with no actual bias against [her] or interest in the outcome of [her] particular case." Norris v. United States, 709 F. App'x 952, 957 (11th Cir. 2017) (quoting Bracy v. Gramley, 520 U.S. 899, 904-05 (1997)). To obtain postconviction relief,

Blazejowski was required to "prove that under a realistic appraisal of psychological tendencies and human weakness, the judge posed a risk of actual bias or prejudgment such that it created an intolerable threat to the guarantee of due process." Id. (internal quotation marks and citation omitted). Blazejowski has not met this standard of proof. She fails to demonstrate that the judge's remarks during the VOP hearing created "an intolerable threat to the guarantee of due process." Id. Accordingly, she is not entitled to federal habeas relief on the claim in Ground Ten.

## VII. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Blazejowski seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Blazejowski "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

47

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED**:

1.     The Amended Petition (Doc. 5) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.     The Clerk of the Court shall enter judgment denying the Amended Petition and dismissing this case with prejudice.

3.     If Blazejowski appeals the denial of the Amended Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper

that may be filed in this case. Such termination shall serve as a denial of the motion.

4.     The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this _____ day of March, 2024.

**HARVEY E. SCHLESINGER**
United States District Judge

Jax-10  3/26
c:     Tawny Blazejowski, #156630
       Counsel of Record